All right, our next case is 23-1000 Pryor v. School District No. 1. Mr. Ringel, you may proceed. Thank you, Your Honor. May it please the Court, Andrew Ringel on behalf of the defendants' appellants in this matter. We're here today on an appeal of a grant of a preliminary injunction in a First Amendment retaliation case. There are a variety of issues that we raise in our brief. I'm happy to talk about all of them. I'm happy to answer any of your questions. The focus that I wanted to initially raise with respect to the argument is what the district court did in its analysis of the factors of a preliminary injunction. Before you start that, have you abandoned the idea that this is a disfavored injunction? No, Your Honor. I'm happy to address that if you would like, Judge Carson. We believe that it is a disfavored injunction and that it requires a strong showing under this court's precedent. The specific issue that makes it a disfavored injunction is the notion that in addition to eliminating the restrictions that are outlined in Mr. Thompson's October letter, it also has an anti-retaliation provision. The scope of the anti-retaliation provision demonstrates that it's a disfavored injunction because it changes the status quo in a couple different ways. If you look at the language of the injunction that was entered, Your Honor, it encompasses anti-retaliation against Mr. Pryor for filing the lawsuit. It encompasses anti-retaliation against Mr. Pryor's family for his filing the lawsuit. And it encompasses anti-retaliation against the Robert F. Smith STEAM Academy for Mr. Pryor's filing the lawsuit. Wouldn't that be implicit in any injunction? You can't retaliate based on the misbehavior the district court found? That's right, Your Honor, but that still makes it an affirmative injunction. Those things change the status quo. We also believe that they're not specific enough, that they're too vague for purposes of Rule 65's analysis. You're not saying that the district can retaliate against him for filing the lawsuit? I'm not saying that it can retaliate against him, Your Honor. The problem is an injunction needs to both be specific in saying what the scope of the anti-retaliation provision is. And when you designate a school as a subject against retaliation without defining what the school means and who is encompassed with it, obviously a school is more than a building, Your Honors. A school is students, teachers, parents, administrators. What is the scope of the injunction? It goes to Judge Carson's point, question. It's both affirmative and, therefore, a disfavored injunction under cases like this courts-free-the-nipple case. It's also vague and doesn't meet the requirements of Rule 65. Is it possible for an injunction to be partially a disfavored injunction and partially not? I'm not sure that I... Because part of this, you would agree, does preserve the status quo. I would agree with that, Your Honor. So I have not seen cases from this court making that distinction. Is an injunction partially disfavored or partially not? It would seem to me, though, that at least the parts of the injunction that are disfavored would require a strong showing under free-the-nipple and all of those other cases. In the proceeding below, was there any... I guess my question is, with the injunction covering more than just Mr. Pryor, was there a request by Mr. Pryor that the injunction reach his family, the school? So there may have been in the motion for preliminary injunction itself or in the proposed order that the plaintiff submitted as part of that. I don't have a specific memory about that, Your Honor. Was there evidence at the hearing about a need to enjoin any kind of action against the school or his family? There was discussion at the hearing related to a vote of the Board of Education that occurred during the hearing related to moving the location of the school from one location to another location in a subsequent school year. But that was not part of the scope of what the district court ruled in the actual injunction. There's no discussion of that in the order. There is discussion of that as part of the evidence that came in during the hearing, Your Honor. And that goes to the vagueness, Your Honor. If the court's goal below was to say you can't do anything related to the operations of the school that's considered retaliatory, that conceivably the court could have issued an order along those lines. But it just has a general anti-retaliation provision. And I don't believe that meets the requirements of Rule 65. The central issue that I like to raise with the court is if the court looks at the analysis of the factors that the district court did below with respect to the preliminary injunction, it's starting on page 19 of the district court's order. If you examine those, the prism in which the district court looks at that is the single complaint from Mesa Lynch, the Montbello High School principal. What the court doesn't do below, and I believe that the fact of not doing this is abuse of discretion in and of itself and warrants reversal, is actually look at all of the evidence that exists. If one looks at Mr. Thompson's letter, it is very clear that he bases the decision to impose the restrictions on the totality of Mr. Pryor's conduct over a several-year period of time. Do you agree that that's a factual question? I believe that it's in part a factual question. I understand, Judge Matheson, where you're likely going with this. Facts on a preliminary injunction are subject to clearly erroneous standard of review. I understand that. But it seems to me that the way that the facts are considered or not considered by the district court is different than a fact question, or at least a straight-up fact question. Well, I understand that point, but the district court did zero in on one aspect of the evidence of the hearing and found from Mr. Thompson's testimony that the catalyst for the letter was Ms. Lynch's complaint and the follow-up investigative report. I understand that the letter goes into other things, but that's what Mr. Thompson said prompted the letter with restrictions. And I hear you're already making the argument that it wasn't just the complaints by Ms. Lynch, but that's what the district court found generated the letter. So what do we do with that if that's a fact, and do we have to say it's clear error for you to prevail? I don't think you have to say it's clear error for me to prevail, but I think it is clear error. So let me unpack it in the layers that I think your question warrants, Your Honor. I've got a lot of layers going on. You're a very nuanced judge. I worked with Mr. Marks for a long time, so we think layered together, Your Honor. Anyway, the issue first, what Mr. Thompson's testimony is, and his testimony is in the record about this so-called catalyst issue. The catalyst was him to look at the totality of the history of Mr. Pryor's relationship with the Denver Public Schools. It wasn't a catalyst for the letter. He testified that the catalyst of Ms. Lynch's complaint was to cause him to look at the history in its totality. It's important to read Mr. Thompson's letter, because Mr. Thompson's letter, and it's quoted in part in the record, and it's clearly in the appendix in its entirety. If you read the letter, the imposition of the restriction is based on all of the investigations, on all of the data, on all of the history. Those were mostly social media posts over, what, 24 months, 18 months? Respectfully, I disagree, Your Honor. The two critical factors and the critical issues that I think the court should focus on is the February 16, 2021 meeting involving Ms. Mendez, which was a meeting that occurred related to the STEAM Academy. That was not a public meeting. It was a meeting related to the operations and the enrollment of the STEAM Academy. And then Mr. Pryor's interactions with Dr. Hudson that occurred subsequently, mostly on the telephone and text messages. And when was that? That was... Ms. Hudson made a complaint in August of 2021. That was the one that was investigated by the outside investigator. And so... Those are over a year before the ban letter. So that's true, Your Honor, and that's why it's important for the court, this court, to actually look at the totality, the information available to Mr. Thompson that was discussed and ultimately adopted by the superintendent, Dr. Morera. What was Mr. Pryor's conduct that really precipitated the investigation and the ban letter? I mean, I think the story you're advocating is it's a cumulative situation. And finally, we reached the point where something had to be done. Respectfully, Your Honor, I don't think it's a story because the letter itself says it's an evaluation of the totality of his things. But the occasion for Mr. Thompson to look at it were two things. One, Ms. Lynch's complaint that was then investigated internally, and that happened in October of 2022. And then the October 12th interaction with Ms. Mendez and Mr. Carpenter that happened after the Board of Education meeting. Was there any personal interaction between Mr. Pryor and Ms. Lynch? The interactions between... In person? No. The interactions involving Mr. Pryor and Ms. Lynch and Ms. Lynch's husband had to do with posts on Facebook and the like. What were the threats? How were those perceived as threats, or how were they disruptive to the operations of the school district? He's not an employee, he's a parent that's involved. So I think that it's important for the court to not just make the mistake that the district court did, which is just look at whether the specific allegations involving Ms. Lynch were disruptive. I think it's important for the court to look at all of the allegations, because the disruption prong from the perspective of the Denver Public Schools has to be more broadly understood. But it is true, there is no direct threat to Ms. Lynch. There may be reputational threats to Ms. Lynch and her husband, who happened to work for the other school district that was involved in this so-called Tegan football game. But there are direct threats in the record that I think the court needs to pay attention to, that are ignored by the district court. There are direct threats that Anthony Smith, the deputy superintendent, testified to about, and excuse my language, Mr. Pryor indicating that he wanted to kick his ass, and had threats of wanting to have physical fights with him. There's also a threat related to physical confrontation between Mr. Pryor and Nikki Yolick. I mean, it seems though that you didn't really press, and your witnesses didn't highlight, in the proceeding below, the physical nature of any threats. It seems to me that everybody was more of the agreement that it was verbal, and maybe irritating to them, but not physically threatening. I don't agree with that, Your Honor. Dr. Smith clearly testified that he perceived these as physical threats, and that there was the request by Mr. Pryor on two occasions to have a physical fight, to meet him and have a physical fight between those two men. Now, that's part of the context that Mr. Thompson was looking at, and that's why it's important, and I've stressed throughout this argument, that the context matters, and the sort of narrow focus on this is just about Ms. Lynch, this is just about Facebook posts, this is not about the entirety of the history. Counsel, this question may relate to the balance of harms factor, at least I think it might, but would lifting the preliminary injunction make that much of a material difference in the sense that Mr. Pryor could continue to post on Facebook, attend the board meetings, participate in public comment, call, email, and text. If he's been a disrupter through all of those avenues, even under the restrictions, he can continue to do all of those things, can't he? He could, and that's the point, Your Honor. The balance of the interests here are don't support this, because if you read the letter closely, and you may have finished my thought. You may. Thank you, Your Honor. If you read the letter closely, as modified in the appeal, Judge Mathison, you're absolutely correct. It's essentially, as we argued in our brief, a time, place, and manner restriction. It's essentially saying you can't be at our facilities, but you can do anything in advocacy that you want that's outside the scope of physically being in the facilities of the district. But after his appeal, he could still be at the facilities as a member of the public, so you haven't even excluded him completely from the facilities. That is correct, Your Honor. And so maybe we could have done more, but the goal was, with the letter as I understand it, is to narrowly make it so that he wasn't directly interacting with the staff of the district, because that was the problem and that was the threat. And that was the perception of the disruption, Your Honor. Thank you, counsel. Time's expired. Good morning, Your Honors. May it please the Court. My name is Andy McNulty. I represent Plaintiff Appellee Brandon Pryor, who's with us in the courtroom today. I'm going to start off just by addressing a question by Judge Mathison about the under-inclusivity of the ban letter, which shows its faults. Under First Amendment case law, when a restriction is under-inclusive, in other words, it doesn't address the actual harms that the restrictor is trying to address. It shows that the restriction itself is a violation of the First Amendment, and that's one way you can show that. And so I just wanted to start off by showing that the harms that they're claiming in this case and the harms that they're advancing are not addressed by the letter, and they're also not supported by the record evidence. Your Honors, this case is at its core about Brandon Pryor's advocacy for racial equality within Denver Public Schools in far northeast Denver. So I guess if their justification on the physical threats was legitimate, for lack of a better term, they would have banned him completely. Is that where you're getting at on the under-inclusivity? That's correct, Your Honor. Yeah, and that's a well-established principle in First Amendment case law from the Supreme Court to this Court's jurisprudence as well. And so that shows that this ban letter wasn't actually to address the threats. It was actually to chill him from speaking and take away the thing that he actually cared about the most. He had never threatened anyone as a volunteer football coach, but they took that away from him because they knew that he cared about it a lot. They knew that he cared about his school, and he never threatened anyone at his school, and so they took that away from him as well. How do you know that, that they were targeting what he cared about? Is that in the record? Well, Your Honor, I think it is because Mr. Pryor testified about how this impacted him personally and how this was something that his work as a volunteer football coach and his work in the community as a founder of the school were two things that he spent a significant amount of his free time on. He wasn't a paid employee. He wasn't someone who the district was paying to do these things. The district knew his priorities within DPS, and they targeted those two things rather than addressing the actual harms that they alleged Mr. Pryor was causing. And now, I alluded to this earlier, but Mr. Pryor, you know, he's a community man. He's someone who cares. He's a volunteer football coach, and he helped found a school, and that's why we're here today is because they retaliated against him for speaking out for racial equality within the district. Now, Mr. Pryor, through his work in the community, uncovered what he saw as cronyism and corruption within Denver Public Schools, and instead of standing idly by, he spoke out via social media and through a community news program to inform his community about those things, and then he was issued a ban letter by the school. If the school district perceived some of his statements, even social media statements, as creating a risk of physical harm or, you know, a serious confrontation, could that, in part, justify some restrictions on his interaction with school district personnel? If there was an actual threat, sure. If there had been an actual threat, but that's not what the district court found, and I don't think the district court's findings are clearly erroneous on the facts in this matter. You know, and that's what the testimony showed, too. The only threat Mr. Pryor ever posed to anyone, and I use this word threat in a way that's not what you would typically think of as a threat within the First Amendment context, which is a true threat, is a threat to someone's professional reputation or their professional job. He was calling for people to get fired, and that's what Ms. Lynch testified to. That's what the testimony was about, Dr. Hudson, at the hearing. That's what the testimony was about, Mr. Smith, at the hearing. Mr. Pryor consistently would call for people who he believed were impeding progress within DPS and were impeding progress towards racial equality within DPS for their jobs. Is there a point where a school district can, I'm not quite sure how to phrase this, but sort of enforce a code of civility of the public interactions with the school district to maintain some level of professionalism or civility? Can the school district factor something like that? They do have a policy, an anti-bullying, anti-harassment policy. At some level, that can be enforced, can it? Consistent with the First Amendment. Sure, sure. And if speech is not protected, if it is legal harassment or if it is a true threat or if it is fighting words, then it's not protected speech. That's just the way it is. But it can't have a policy that says you have to be polite to everyone. That wouldn't be enforceable under the First Amendment. As we've seen time and time again, even in courtrooms where someone wears a jacket that says, excuse my language, fuck the draft on the back. Or, you know, in this court's case in Klen versus the city of Loveland, where people were calling city employees and complaining about permits and using pretty salty language, the court has consistently said, this court, the Supreme Court, has said that unsavory language and harsh criticism, even when it is uncivil, is fully protected under the First Amendment. But I could enforce outbursts in the courtroom, and presumably the school board superintendent could enforce outbursts in a school board meeting, right? That is 100% true, Your Honor. And those are, as you know, designated or limited public forums or even non-public forums, right? So like a school board meeting would be a limited public forum or a designated public forum, depending on what kind of school board meeting it is and what kind of public comment was going on. Here is a non-public forum, so you can enforce whatever restrictions you want. But you couldn't, for example, ban someone from the courthouse for posting on social media, Judge Tinkovich should be impeached and lose his job. I've seen that. Yeah. It wasn't for me, but. I'm grateful for that. And so that's the distinction, I think, here. And that's the distinction we have here, is we have someone who is a passionate advocate. He's out in the community. He's posting on social media. And social media is the new editorial, you know, like from Pickering, the teacher who writes the newspaper and posts an editorial. A Facebook post is a new editorial. That's what people are doing nowadays. And so you see the district here taking action against Mr. Pryor because he's engaging in free speech activity, and that's what the record shows. Yes. So I was posing to your opposing counsel the idea that the school board didn't press below this physical threat kind of evidence. And he disagreed and was talking about Dr. Smith testifying that he perceived a physical threat. Can you tell me what you think about that? Was the district court's finding clearly erroneous in light of that testimony? I think that the district court's finding wasn't clearly erroneous because I think, and also I think it was factually right, that it discredited that testimony because Mr. Pryor himself testified to the opposite. If you look at his testimony in the record on 430 to 431, 458, and 463, he talks about the interaction with Mr. Smith, and he talks about how there was no threat of physical violence. Now with respect to the comment about Nikki Yalek, Mr. Pryor also testified about that, and he said that when he sent a message to Mr. Yalek that said, come meet me or send me a dress, he had in the past done that and went and met people and had productive conversations. He said that Facebook sometimes cannot be a good place to have productive conversations. I'm sure we all know that. You've been online, you're in the comments section, and someone says something and you're just talking past each other. But when you get in person, sometimes you can bridge that gap, and he's done that in the past, and he talked about that in the record on 581 to 582. Okay. The scope of the injunction at the end, it does appear to reach out to Mr. Pryor, his family, and the STEAM Academy. How did the hearing evolve in such a way where his family and the STEAM Academy get protection from the injunction? Yeah, I think it was partially asked for in the PI motion itself, which is on 34 through 43 in the record, but also it came out during the hearing that there was a secret vote held to move the STEAM Academy while Mr. Pryor and Mrs. Pryor, who are two founders of the school, were in the hearing itself. And that was an unprecedented thing. Usually founders of the school are involved in any decision to relocate the school. Now, there's testimony in the record about that. I don't have the exact site for that. But there is testimony about the moving of the school during the hearing itself and the stress that that caused on Mr. Pryor and how they believed it was related to their bringing of the lawsuit and their challenging of the ban letter. So that's kind of how that evolves. And it just makes sense because Mr. Pryor is very interconnected with the STEAM Academy, and that's kind of like his baby, as I talked about earlier. It's something that he really cares about. And if you look at, again, if you look at the ban letter and what it goes after, it goes after the things he cares about. He cares deeply about volunteer coaching. He talked about how missing the senior game for those kids because of the ban letter, who he'd coached since they were in fourth grade, was so devastating to him. They knew what would deter Mr. Pryor from continuing to speak. And it did deter him from continuing to speak. He testified that he didn't speak. He was invited to go speak on the Brother Jeff Show, which is a local community news show, and he didn't go speak because of the ban letter. He testified that he didn't post anymore on social media because of the ban letter. And that is all on 470, 553 of the record, and then also 560 to 561 of the record. And Mr. Pryor also said that he stopped contacting DPS officials because of the ban letter. He didn't want to violate it. He wanted to be able to get back to the things he loved, which is coaching and building community within his school, being a positive male role model for kids who don't have it. Counsel, could I just jump in and ask you about, I think, one of the main arguments that the district is making here, and that is that the letter was based not simply on the Ms. Lynch complaint and follow-up investigation, but was really the totality of all the interactions and incidents and just the history of his relationship with the school district. So first of all, can you speak to that? And I know the district court found that the Ms. Lynch complaint was the catalyst for the letter, but the school districts are pushing back on that now, and I'd like to hear your response to that. Yeah, I'm happy to respond. First, I'd say that it doesn't really matter because I think that pretty much all the speeches he engaged in was protected speech from the beginning to the end, everything that they cite in that letter. But if you look at the timeline, in 2020, in October, Mr. Pryor criticizes Dr. Hudson for the first time, and he sends those text messages and he calls her on the phone. In 2021, in February, he criticizes Ms. Mendez in that meeting. In 2021, in August, he again criticizes Dr. Hudson over the phone. And then you have this letter in January of 2022 that was never given to Ms. Pryor, that was written by the district that said he imposed some restrictions on him. And in that letter, they didn't ban him from coaching. They knew about all the things that had happened before that. They didn't take the restrictive action that they did in the later letter, in the ban letter that is at issue here. And so that, I think, informs the district court's finding that it was based almost solely on the Lynch evidence in the record. But it also, the district court rightly found that the attorney, Thompson, the general counsel for DPS, testified at the hearing that the complaint by Lynch was the catalyst for the letter. And that's at 990 through 96 and 1085 in the record. Also, Dr. Morero, who's the superintendent, said that the ban letter was so that DPS employees would no longer feel that, quote unquote, attacked by Mr. Pryor, and that's at 995. And then Thompson also testified at 1057 that the ban letter was based on calling for dismissal or resignation of DPS officials. Let me make sure I understand your position. Sure. If we're looking at the preliminary injunction factors and the first one, likelihood of success, that this argument that the district's making about how to view the letter, at least from your standpoint, you're saying it doesn't make a difference. I'm saying it doesn't make a difference, but I'm saying that the district court was fine in finding that it was, the district court had valid basis that are not clearly erroneous for thinking that the letter was completely based on the Lynch complaint. But I'm saying that it doesn't matter either way because I believe that Mr. Pryor's speech prior to the Lynch complaint was also protected speech that he was entitled to make and that they couldn't base the restrictions off. I have 30 seconds left, so unless anyone else has any other questions, I'll finish off here. Thank you, counsel. Thank you. Counsel, excuse me. I appreciate the arguments. The case is submitted.